883 P.2d 407

**Fred PIPER, individually and as the Personal Representative of the Estate of Ila M. Piper, Plaintiff–Appellee,**

v.

**BEAR MEDICAL SYSTEMS, INC., Defendant–Appellant.**

**No. 1 CA–CV 91–0457.**

Court of Appeals of Arizona, Division 1, Department E.

Nov. 18, 1993.

Review Denied Nov. 1, 1994.

Mangum, Wall, Stoops & Warden by Daniel J. Stoops, Flagstaff, for defendant-appellant.

Meyer, Vucichevich & Burns by Rad L. Vucichevich, Annette T. Burns and Bonn, Luscher, Padden & Wilkins, Chartered by Randall D. Wilkins, Phoenix, for plaintiff-appellee.

## OPINION

VOSS, Presiding Judge.

Bear Medical Systems, Inc. ("Bear") appeals from the judgment following a jury trial in a products liability action brought by Fred Piper, individually and as personal representative of the estate of Ila Piper. We hold in this opinion that reasonably foreseeable modifications of a product will not bar recovery against the manufacturer. However, the manufacturer's conduct in this case was insufficient to justify a punitive damages instruction. We affirm the trial court's denial of a directed verdict and judgment notwithstanding the verdict ("JNOV") for the manufacturer but reverse the punitive damages award.

## FACTS

After undergoing surgery at Marcus J. Lawrence Memorial Hospital for the removal of two malignant lung tumors, Ila Piper developed adult respiratory distress syndrome ("ARDS"). She was placed on the Bear 2 Adult Volume Ventilator ("Bear 2") to assist her breathing.

An expiratory arm is attached to the Bear 2. The expiratory arm begins with an exhalation valve and a water collection trap. The water trap is connected to a flow tube with a mounted flow sensor to measure the volume of exhaled gas. Attached to the end of the flow tube is a one-way check valve which permits air flow in only one direction. The check valve, manufactured by Bird Products Corporation, prevents the patient from inhaling through the expiratory arm, ensuring that any gas going into the patient comes from the sterile ventilator. The component parts of the Bear 2 expiratory arm are diametrically indexed; this means the parts cannot be reversed, superimposed, or placed in a configuration other than the intended sequence unless other components are added.

Here, a respiratory therapist at the hospital used a rubber universal adaptor, manufactured by Bear, to connect a bacterial filter to the flow tube on the Bear 2 ventilator used by Mrs. Piper. The therapist added the filter to the ventilator to prevent bacteria emitted through Mrs. Piper's expiration from contaminating those who worked near her.

Approximately ten days after Mrs. Piper was placed on the Bear 2, a nurse accidentally knocked off the expiratory arm causing the ventilator alarms to sound. The nurse attempted to reassemble the parts and sought the help of another nurse because no respiratory therapist was on duty at the time. One of the nurses inverted the one-way check valve on the ventilator when reassembling and the alarms on the Bear 2 continued to sound.

The proper procedure in this situation is to disconnect the patient from the ventilator and use other medical equipment to manually assist breathing. However, Mrs. Piper was not removed from the ventilator for several minutes, during which the inverted check valve permitted her to inhale but prevented her from exhaling. Because the check valve was inverted, the pressure increased in Mrs. Piper's chest, preventing blood from returning to the heart or circulating to the brain, which in turn caused serious, neurological damage. After this incident, Mrs. Piper's condition steadily deteriorated. With her family's consent, she was eventually taken off the ventilator and died shortly afterward.

Fred Piper, the surviving spouse, filed a wrongful death action against several defendants including Bear. Only the claims against Bear are involved in this appeal. After denying Bear's motions for directed verdicts, the trial court submitted the case to the jury which returned a verdict finding zero compensatory damages but awarding punitive damages. The trial court rejected this verdict and instructed the jury to continue its deliberation. The jury later returned verdicts for the plaintiff, awarding $10,000 in compensatory damages and $750,000 in punitive damages. The trial court denied Bear's post-trial motions for JNOV and for a new trial, and entered judgment on the jury verdicts. This appeal followed.

## STRICT PRODUCTS LIABILITY

The test for granting a directed verdict and a JNOV is the same. *Times Mirror Co. v. Sisk,* 122 Ariz. 174, 178, 593 P.2d 924, 928 (App.1978). These motions should be granted only "if the facts produced in support of a claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *See Orme School v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). On appeal from denial of motions for a directed verdict or JNOV, we view the evidence and all reasonable inferences in a light most favorable to the nonmoving party. *Rocky Mountain Fire and Casualty Co. v. Biddulph Oldsmobile,* 131 Ariz. 289, 292, 640 P.2d 851, 854 (1982).

A prima facie case of strict products liability is established if (1) the product is defective and unreasonably dangerous, (2) the defective condition existed at the time the product left the defendant's control, and (3) the defective condition is the proximate cause of the plaintiff's injuries. *Gosewisch v. American Honda Motor Co.,* 153 Ariz. 400, 403, 737 P.2d 376, 379 (1987). Three types of defects can result in an unreasonably dangerous product: manufacturing defects, design defects, and informational defects encom-

passing instructions and warnings. *Id.* Mr. Piper claims the Bear 2 was an unreasonably dangerous product because of its design and the absence of adequate warnings.

### Design Defect

The Bear 2, first manufactured in 1982, evolved from the Bear 1 ventilator which was developed in the mid–1970s. Both machines incorporated a one-way check valve but only the Bear 1 required the use of a universal adaptor, a flexible fitting that connects parts having different diameters. The universal adaptor was needed to attach the water trap to the flow tube on the Bear 1. Over a period of fourteen years, Bear received reports of eight incidents in which the expiratory arm of the Bear 1 became dislodged and the one-way check valve was reassembled in reverse.

Bear redesigned its ventilator so that the Bear 2 water trap fits directly into the flow tube of the expiratory arm; therefore a universal adaptor is no longer included as a component part, nor is it required for assembly. However, instructions for the water trap indicate a universal adaptor is necessary to test the Bear 2 prior to use, and no warning is provided to deter use of the adaptor after testing.

It was undisputed that the one-way check valve could not be inserted backwards into the Bear 2's standard component parts. However, with the addition of a universal adapter into the Bear 2 expiratory arm, the one-way check valve could be reversed despite diametrical indexing.

It was common for respiratory therapists to modify the expiratory arm by adding parts including the addition of bacterial filters. This was a common and well-known practice in the respiratory therapy industry, and Bear knew its ventilators were being modified.

Bear asserts a manufacturer's knowledge that its product is being modified cannot extend the manufacturer's liability to cover injuries resulting from such modifications. Bear contends the trial court erred in denying its motions for a directed verdict and JNOV because Mr. Piper failed to meet his burden to prove the Bear 2 was defective when it left Bear's control—therefore he could not show the Bear 2 was the proximate cause of Mrs. Piper's death.

■ Proximate causation encompasses causation-in-fact and is generally a jury question. *Gosewisch,* 153 Ariz. at 404, 737 P.2d at 380. However, proximate cause is not merely a finding that there is a connection between defendant's conduct and the injury. It is a legal determination that certain conduct is significant or important enough that the defendant should be legally responsible. *See* W. Page Keaton, et al., *Prosser and Keaton on the Law of Torts* § 42 at 273 (5th ed. 1984).

There is general agreement that where misuse or modification of a product is unforeseeable and causes injury, the connection with the manufacturer is severed so that the manufacturer cannot be held liable. *See, e.g., Mason v. E.L. Murphy Trucking Co.,* 769 F.Supp. 341 (D.Kan.1991); *Watts v. TI, Co.,* 561 So.2d 1057 (Ala.1990); *Mattes v. Black & Veatch,* 828 S.W.2d 903 (Mo.App.1992); *Ogle v. Caterpillar Tractor Co.,* 716 P.2d 334 (Wyo.1986). However, there is significant disparity among court opinions addressing the effect of foreseeable product modifications on a manufacturer's liability. *See generally* 3 *American Law of Products Liability* 3d, § 43:16 (1987) (discussing the applicability of foreseeability to liability for injuries caused by altered or modified products). The Restatement (Second) of Torts, section 402A, comment p (1965), takes no position on this issue.

In some jurisdictions, the manufacturer's responsibility for providing a safe product does not extend beyond the time of sale, and the foreseeability of a substantial modification of its product is irrelevant to the manufacturer's liability. *See, e.g., Hines v. Joy Mfg. Co.,* 850 F.2d 1146 (6th Cir.1988) (holding that under the Kentucky Products Liability Act an unauthorized modification precludes recovery against the manufacturer, and the common law concept of foreseeability will not be read into the statute). *Accord Hutt v. Gibson Fiber Glass Products, Inc.,* 914 F.2d 790 (6th Cir.1990); *Robinson v. Reed–Prentice Division of Package Machinery Co,* 49 N.Y.2d 471, 426 N.Y.S.2d 717, 403

N.E.2d 440 (1980) (holding the manufacturer of a molding machine was not liable for injuries sustained by a worker who was injured when his hand went through an opening cut in a safety gate even though the manufacturer had sold other machines to the same purchaser and knew they had been similarly modified to meet production needs).[2] *See generally* 3 *American Law of Products Liability* 3d, § 43:17 (1987) (discussing cases in which product modifications that destroy the safety feature are not the manufacturer's responsibility even if the modification was foreseeable); David J. McAllister, Note, *Product Modifications: The Effect of Foreseeability*, 42 U.Pitt.L.Rev. 431 (1981) (advocating limiting a manufacturer's liability to exclude injuries caused by modifications regardless of foreseeability).

Some jurisdictions apply the concept of foreseeability to both misuse and modification of a product, analyzing whether the misuse or modification is "superseding" or "intervening" conduct for determining proximate cause. If the product misuse or modification is foreseeable, it will not bar recovery against the manufacturer. *See, e.g., Marois v. Paper Converting Machine Co.*, 539 A.2d 621 (Me.1988) (holding modification of a paper rewinder by adding a "jog" button to clear paper jams could give rise to liability of the manufacturer if the modification was foreseeable); *Foster v. Devilbiss Co.*, 174 Ill. App.3d 359, 124 Ill.Dec. 600, 529 N.E.2d 581 (1988) (holding manufacturer of a paint sprayer could be found liable for a design defect because the removal of the sprayer's trigger and nozzle guards was foreseeable); *Shipman v. Fontaine Truck Equipment Co.*, 184 Mich.App. 706, 459 N.W.2d 30 (1990) (holding manufacturer of a feed trailer could be held liable for injuries to a worker who fell through a hole cut in the protective grating over an auger when it was foreseeable that a hole would be cut because the trailer had a bolted shield over the access door).

■ Arizona has long recognized "unanticipated use" or "misuse" as a defense to products liability. *See O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 561, 447 P.2d 248, 253 (1968). However, misuse does not bar recovery if the misuse was reasonably foreseeable. *Gosewisch*, 153 Ariz. at 407, 737 P.2d at 383; *Kavanaugh v. Kavanaugh*, 131 Ariz. 344, 348–49, 641 P.2d 258, 262–63 (App.1982); *Czarnecki v. Volkswagen of America*, 172 Ariz. 408, 415–16, 837 P.2d 1143, 1150–51 (App.1992). The relationship of foreseeability to product modification is less clear. *Compare Rodriguez v. Besser Co.*, 115 Ariz. 454, 565 P.2d 1315 (App.1977) (holding manufacturer had no duty to warn of dangers from product modifications of which the manufacturer had actual knowledge) *with Brown v. Sears, Roebuck & Co.*, 136 Ariz. 556, 667 P.2d 750 (App.1983) (holding manufacturer of a power saw, that was safe if used with a grounded extension cord, could be liable for failure to warn if it was foreseeable user would attach improper cord).

In 1978 the Arizona Legislature enacted Ariz.Rev.Stat.Ann. ("A.R.S.") sections 12–681 to –683 (1992). Section 12–683 establishes affirmative defenses that bar a manufacturer's liability if the product conformed to the state of the art when sold, the proximate cause of the plaintiff's injuries was a misuse that was not reasonably foreseeable, or

> [t]he proximate cause of the incident giving rise to the action was an *alteration or modification of the product which was not reasonably foreseeable*, made by a person other than the defendant and subsequent to the time the product was first sold by the defendant. . . . (Emphasis added.)

A.R.S. § 12–683(2).

■ Section 12–681(4) defines "reasonably foreseeable" as an "alteration, [or] modification ... of the product which would be expected of an ordinary and prudent purchaser, user or consumer and which an ordinary and prudent manufacturer should have anticipated." At least two commentators cite these statutes for the proposition that only unfore-

---

**2.** Whether a product is considered defective by New York courts may depend upon whether the court characterizes the user's conduct as "modifying" or "misusing" the product. Foreseeability of product misuse is relevant and foreseeable product misuse will not bar liability of a manufacturer. *Amatulli v. Delhi Construction Co.*, 77 N.Y.2d 525, 569 N.Y.S.2d 337, 343–44, 571 N.E.2d 645, 651–52 (1991) (dissenting opinion).

seeable modifications of a product will bar recovery against the manufacturer under Arizona law. *See* 3 *American Law of Products Liability 3d,* § 43:16 n. 80; 1A Louis R. Frumer and Melvin I. Friedman, *Products Liability,* § 3.03[4], n. 3 (1993). We agree.

■ What is necessarily implied in a statute is as much a part of it as what is expressed. *Maricopa County v. Douglas,* 69 Ariz. 35, 39–40, 208 P.2d 646, 648 (1949). Section 12–683 expresses the relevance of foreseeability to a manufacturer's liability for an altered or modified product and section 12–683(2) identifies the kind of alteration or modification that will bar recovery. In a statute, "the expression of one or more items of a class indicates an intent to exclude all items of the same class which are not expressed." *Pima County v. Heinfeld,* 134 Ariz. 133, 134, 654 P.2d 281, 282 (1982). We therefore conclude that reasonably foreseeable modifications of a product will not bar recovery against the manufacturer.

■ Whether misuse of a product is reasonably foreseeable is a question of fact for the jury. *Kavanaugh,* 131 Ariz. at 349, 641 P.2d at 263. Whether a modification or alteration is reasonably foreseeable is also for the trier of fact. *E.g., Marois,* 539 A.2d at 624. *See generally* 3 American Law of Products Liability, *supra* at § 43:16 (citing cases from jurisdictions following this principle). However, if reasonable minds could not differ, a misuse or modification can be deemed unforeseeable as a matter of law. *See Brown,* 136 Ariz. at 562, 667 P.2d at 756. We therefore consider whether there was sufficient evidence from which the jury could find that the addition of the bacterial filter to the Bear 2 expiratory arm was reasonably foreseeable.

Dr. Robert B. Spooner, an expert in safety testing medical equipment, testified the use of bacterial filters in breathing machines, specifically Bear ventilators, was common by 1985 when Mrs. Piper was placed on the Bear 2. He stated it was reasonable that bacterial filters would be used to improve the care of patients both in preventing exhalation of bacteria into the hospital room and in removing additional moisture in the flow tube to improve the accuracy of measurement of

exhaled breath by the flow sensor. In Dr. Spooner's opinion, manufacturers of medical equipment have a responsibility to anticipate such improvements involving their products.

Jim Mattison, the respiratory therapist who added the filter to Mrs. Piper's ventilator, testified he called the sales company that represented Bear prior to installing the filter. He inquired whether filters were being used on ventilators and was told that they were recommended. However, Mattison said he would not have added the filter if he had been warned of the potential dangers.

Peter Holm, a respiratory therapist who had been a Bear consultant, testified that the use of bacterial filters began in the late 1970s and became much more prevalent by 1985.

The doctor's and therapists' testimony was sufficient evidence from which a jury could find that the addition of the bacterial filter to the Bear 2 was reasonably foreseeable.

We next consider whether there was evidence to support a finding that the Bear 2 was defective and unreasonably dangerous and a proximate cause of Mrs. Piper's death.

Holm testified that in 1980 he witnessed a near fatal incident involving the reversal of the one-way check valve on a Bear 1 ventilator. Because of his concern with safety, and because of his prior relationship with Bear, he contacted Bear's vice-president and discussed the incident directly with him. In 1981, Holm wrote a letter which was published in *Chest Magazine,* a widely recognized journal in the respiratory therapy field, detailing the near-fatal incident and offering his solution to the problem. His letter suggested inserting a screw in the large end of the check valve so that it could not accidentally be reversed. Holm described this as a "quick fix," and suggested other manufacturing solutions including a screen across the outflow end of the check valve, a pin through the valve, or a large plate over the valve.

At the time the Bear 1 was manufactured, a committee of the American National Standards Institute ("ANSI") had promulgated standard Z79.7–1976 for the manufacturing of ventilators. The committee, composed of physicians, respiratory therapists, ventilator

manufacturers and representatives of the Food and Drug Administration, created uniform standards for breathing machines "to insure that machines designed for this purpose shall be safe and reliably effective...." Although ANSI's standards were not mandatory, they were considered authoritative and were followed by the Food and Drug Administration and most ventilator manufacturers.

Section 2.10.9 of Z79.7–1976 required that if an expired gas outlet, such as a one-way check valve, was fitted to a ventilator, "it shall be designed in such a way that it cannot easily be connected to either 22–, 15–, or 30–mm cones or sockets...." The purpose of this requirement was to prevent reversal of the expired gas outlet by mistake or misassembly. Despite this requirement, the Bear 2 one-way check valve was made with a 22–mm fitting.

Dr. Spooner testified that the easiest way to bring the check valve into compliance was to flare out the end "like the bell on a trumpet," so that no other connections could be made to it. In his opinion, the Bear 2 was defective and unreasonably dangerous at the time it was manufactured.

Bear argues the failure of the hospital to train its nurses to use the Bear 2, and the nurses' negligence in failing to remove Mrs. Piper from the ventilator were the proximate causes of her injuries; however, there was evidence that untrained hospital personnel would have access to the ventilator. Bear's own expert testified it was foreseeable that untrained personnel would use the Bear 2. Further, although the conduct of persons other than Bear contributed to Mrs. Piper's death, there can be more than one proximate cause of an injury, and those causes may act concurrently and in combination to produce injury. *Gosewisch*, 153 Ariz. at 407, 737 P.2d at 383.

We conclude there was sufficient evidence from which the jury could find that the addition of the bacterial filter was reasonably foreseeable, the design of the Bear 2 ventilator was defective and unreasonably dangerous, and therefore a contributing factor to Mrs. Piper's death.

*Failure to Warn*

A product faultlessly made may be deemed "defective" if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning. *Brown*, 136 Ariz. at 563, 667 P.2d at 757. Recovery on this basis generally requires a plaintiff to show the defendant was negligent and knew or should have known of the risk but failed to take reasonable precautions. W. Page Keaton, et al., *Prosser and Keaton on the Law of Torts* § 99 at 697 (5th ed. 1984). Determining whether a warning is adequate to apprise users of dangers in the product is ordinarily a question for the trier of fact. *Brown*, 136 Ariz. at 563, 667 P.2d at 757.

Bear argues it had no duty to warn of the potential dangers from modifying the expiratory arm, and its instruction manual and the directional arrow on the one-way check valve itself provided adequate warnings for the foreseeable class of users.

Bear relies on *Rodriguez v. Besser*, 115 Ariz. 454, 460, 565 P.2d 1315, 1321 (App. 1977), to support its contention that a manufacturer has no duty to warn of dangers that arise from a modification of a product even if a manufacturer is aware of that modification. However, *Rodriguez* is not consistent with later opinions. *See Kavanaugh*, 131 Ariz. at 348, 641 P.2d at 262; *Brown*, 136 Ariz. at 563–65, 667 P.2d at 757–59 (finding foreseeability of misuse relevant to failure to warn). More importantly, *Rodriguez* was decided prior to the passage of A.R.S. section 12–683, which made foreseeability relevant to both product misuse and product modification. To the extent *Rodriguez* is inconsistent with the statute, it is not controlling. We conclude a manufacturer may be liable for a failure to warn of dangers of product modifications that it knew or had reason to know were occurring.

Bear argues a sufficient warning against adding components was provided on the inside cover of the Bear 2 manual. The manual states:

User/Owner Responsibility

The BEAR Medical System, Inc. (hereafter referred to as Bear) equipment and the authorized accessories for it are designed

to function as specified in the relevant instruction manual only when operated, maintained and repaired in accordance with supplied manuals and instructions.... This equipment and any of its accessories and component parts should not be modified.

Bear also relies on page three of the manual which says:

"The BEAR 2 Ventilator is intended for use only by a qualified practitioner, under the direction of a qualified physician."

■ Bear argues because Bear 2 could be sold only to physicians and was intended for use only by doctors or qualified practitioners, any duty to warn was satisfied by warning doctors under the "learned intermediary doctrine." [3] See Gaston v. Hunter, 121 Ariz. 33, 47, 588 P.2d 326, 340 (App.1978). Although we agree the learned intermediary doctrine is applicable to this product, there was conflicting evidence whether the provided warnings were adequate to alert doctors and other trained professionals.

This court discussed a manufacturer's duty to warn in Brown stating:

A distinction must be drawn between instructions (directions) for use and warnings. Instructions are to be followed to secure the most efficient or satisfactory use of the product; warnings are instructions as to dangers that might occur if the instructions are not followed.

136 Ariz. at 564, 667 P.2d at 758 (emphasis in original).

Dr. Spooner testified the statement in the front of the manual was insufficient because it does not identify the danger of adding a universal adaptor or the potential consequences to the patient from the reversal of the check valve. He regarded the statement directing the owner not to modify the machine both as too general to put a user on notice of the danger and unrealistic in light of the constant development of new techniques for improving patient health care.

The manual explains that statements preceded by the word "Warnings" have special significance and mean that "there is the possibility of personal injury to yourself and others." No warning is given in the manual for the danger of reversing the check valve.

Dr. Spooner also noted the danger of reversing the check valve is not mentioned in the "Trouble Shooting" section of the manual. Dr. Spooner believed this section is where an operator would be expected to look. When asked about the arrow on the check valve, he testified some respiratory therapists would understand the meaning of the arrow, but other personnel likely to use the equipment would not understand its significance.

The head of a hospital respiratory therapy department testified he could not tell what the arrow signified or which way the arrow should point when the part was attached to the ventilator. Holm similarly testified the arrow was insufficient to indicate its purpose and flow direction.

Given this evidence, we conclude the jury could find Bear failed to provide adequate warning of the inherent dangers of adding components or reversing the one-way check valve.

### State of the Art Defense

■ Bear also sought a directed verdict or JNOV based on A.R.S. section 12–683(1) which provides a defendant shall not be liable if:

The defect in the product is alleged to result from inadequate design or fabrication, and if the plans or designs for the product or the methods and techniques of manufacturing, inspecting, testing and labeling the product conformed with the state of the art at the time the product was first sold by the defendant.

Section 12–681(6) defines "state of the art" as "the technical, mechanical and scientific knowledge of manufacturing, designing, testing or labeling the same or similar product which was in existence and reasonably feasible for use at the time of manufacture."

---

3. "Learned intermediary doctrine" means the manufacturer's duty to warn is ordinarily satisfied if a proper warning is given to the specialized class of people that may prescribe or administer the product.

"A manufacturer has no duty to make products which incorporates [sic] only the ultimate in safety features." *Raschke v. Carrier Corp.*, 146 Ariz. 9, 11, 703 P.2d 556, 558 (App.1985). However, Bear concedes that economically feasible technology existed in 1982 to design the check valve with a pin, a screw, a screen or a flared end that would have prevented its reversal. But Bear argues because the Bear 2 was redesigned with parts that could not be interchanged, it was justified in rejecting these alternatives.

As discussed in relation to design defect, there was expert evidence the Bear 2 had components that did not meet ANSI standards, was not safe, and alternative designs represented the accepted state of the art. A jury could find from this evidence that the Bear 2 did not conform to the state of the art when it was manufactured.

### THE FIRST VERDICT

■■■ After the jury presented an initial verdict for zero compensatory damages but awarding punitive damages, Bear argued that by declining to award compensatory damages the jury had found Bear was not at fault, and the punitive damages award was surplusage. It requested the trial judge to accept the finding of "no fault" and enter the verdict in its favor after setting aside the improper award of punitive damages.

The trial judge rejected Bear's contention that the jury's verdict evidenced a finding of "no fault" by putting "0" as compensatory damages. We agree with the court's conclusion that the verdict did not indicate the jury's finding with respect to fault and that a reasonable inference was the jury had not followed the court's instructions. We conclude the trial court did not err by refusing to enter a judgment for zero compensatory damages.

The trial court reinstructed the jury as follows:

I am going to instruct you additionally in this case. You cannot assess or award punitive damages without awarding compensatory damages and finding fault on the part of Bear.

I am going to ask you to retire to the jury room again to deliberate this case, and tell you that you please must refer to all of my instructions on the law that I have given you, and specifically page 24 of the instructions, and that is the punitive damage instruction.

After being reinstructed, the jury returned verdicts for $10,000 compensatory damages and $750,000 for punitive damages. Bear then moved for a new trial, arguing resubmission to the jury was tantamount to telling the jury that liability existed, and they needed only insert an award for compensatory damages if they desired to punish Bear.

■■■ We review the denial of a new trial to determine whether the trial court abused its discretion. *Herberman v. Bergstrom*, 168 Ariz. 587, 590, 816 P.2d 244, 247 (App.1991).

■■■ Rule 49(c) of the Arizona Rules of Civil Procedure ("Rule 49") provides that if a verdict is not responsive to the issue submitted, the court shall call it to the jury's attention and send the jurors back for further deliberation. When a verdict is nonresponsive, resubmission is appropriate to give the jury an opportunity to decide the case and prevent unnecessary further litigation. *Pelayo v. Bell*, 13 Ariz.App. 418, 420–21, 477 P.2d 537, 539–40 (1971).

Although the instruction called the jurors' attention to the punitive damages instruction, it also directed the jurors to consider *all* the instructions. Contrary to Bear's assertion, the instruction does not suggest Bear was at fault. It informs the jury that fault and compensatory damages are predicates to awarding punitive damages. We conclude the trial court properly exercised its authority under Rule 49 to give the jury an opportunity to correct an unresponsive verdict.

### PUNITIVE DAMAGES

■■■ Bear sought a directed verdict and JNOV on the issue of punitive damages. A motion for a directed verdict on the issue of punitive damages should be granted if no reasonable jury could find the requisite evil mind by clear and convincing evidence. *Thompson v. Better–Bilt Aluminum Prod-*

*ucts Co.*, 171 Ariz. 550, 558, 832 P.2d 203, 211 (1992).

■■■■ Punitive damages may not be awarded absent a showing of "something more" than mere tortious conduct. *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 330, 723 P.2d 675, 679 (1986). Punitive damages are appropriate only where the defendant's wrongful conduct was guided by evil motives or wilful or wanton disregard of the interests of others. An "evil mind" may be shown by evidence that the defendant intended to injure the plaintiff or "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings v. Apodaca*, 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986). Punitive damages are "undeserved as punishment" unless defendant acted with a knowing or culpable state of mind, or defendant's conduct was so egregious that an evil mind can be inferred. *Gurule v. Illinois Mutual Life and Casualty Co.*, 152 Ariz. 600, 601, 734 P.2d 85, 86 (1987). A jury may infer an evil mind if defendant deliberately continued his actions despite the inevitable or highly probable harm that would follow. *Id.* at 602, 734 P.2d at 87.

■■■■ Mr. Piper claimed punitive damages based on evidence that Bear knew of several accidents involving the Bear 1 and, at the time of trial, had failed to recall any Bear 1 or Bear 2 ventilators or to issue any warnings concerning the danger of the one-way check valve. However, between the time it was first manufactured and sold in 1982 and the date of Mrs. Piper's accident in 1985, Bear was unaware of any problems involving the Bear 2 expiratory arm or reversal of the one-way check valve on the Bear 2.

The court applied punitive damages principles in *Volz v. Coleman Co.*, 155 Ariz. 567, 748 P.2d 1191 (1987), a case involving similar facts to the case at hand. In *Volz* the plaintiff was injured when a stream of fuel ejected through the filler cap of a Coleman stove, crossed a campfire, ignited, and landed on plaintiff. There was evidence the manufacturer knew fuel could spray through the vent hole of the filler cap and knew of past, similar incidents in which this had occurred. Even after the vent-hole filler cap was re-placed with a new design, several hundred thousand stoves possessing the vent-hole filler caps remained on the market, but the manufacturer never issued warnings; nor did it recall the stoves possessing this type of cap.

The court in *Volz* expressly rejected awarding punitive damages. The fact that a manufacturer continued to market a product was not itself enough to show the evil mind necessary for punitive damages. *Id.* at 570, 748 P.2d at 1194. The court found the case involved "negligence or even gross negligence," but it was not a case evidencing "something more," to justify punitive damages. 155 Ariz. at 571, 748 P.2d at 1195.

As in *Volz*, this case may involve negligence, but we believe Bear's conduct is even less worthy of justifying punitive damages. The evidence here was insufficient for reasonable persons to find the requisite evil mind by clear and convincing evidence.

Because of our resolution of the punitive damages issue, we need not address Bear's argument that the verdict was the result of passion or prejudice.

We set aside the award of punitive damages and affirm the judgment as modified.

McGREGOR and KLEINSCHMIDT, JJ., concur.