935 P.2d 876

**DOLE FOOD COMPANY, INC., and Dole Fresh Vegetables, Inc., Plaintiffs–Appellants,**

v.

**NORTH CAROLINA FOAM INDUSTRIES, INC., Defendant–Appellee.**

No. 1 CA–CV 95–0300.

Court of Appeals of Arizona, Division 1, Department C.

Oct. 24, 1996.

Review Granted April 29, 1997.

Review Dismissed as Improvidently Granted June 25, 1997.

Gammage & Burnham P.L.C. by Richard K. Mahrle, Phoenix and Robins, Kaplan, Miller & Ciresi by William P. Linhoff, Jr., Costa Mesa, CA, for Plaintiffs–Appellants.

Nye & Downey, P.L.C. by William J. Downey, Robert L. Frugé, Phoenix, for Defendant–Appellee.

## OPINION

LANKFORD, Judge.

Dole Food Company ("Dole") appeals the entry of summary judgment in favor of North Carolina Foam Industries ("NCFI"). We reverse the judgment.

The appeal involves the adequacy of NCFI's product warnings. Dole filed this product liability action after a welding spark ignited polyurethane foam insulation and caused a fire that substantially damaged a Dole facility. Dole alleged that NCFI, which had supplied the foam, failed to provide adequate warnings. The trial court entered summary judgment on the ground that the warnings were adequate as a matter of law. We reverse because there are disputed issues of fact.

NCFI supplied the foam for Dole's building. Dole had hired a construction company to build an addition to its Yuma vegetable packing and processing plant. Val Lowder, who worked for a subcontractor, Mountain States Foaming, installed the polyurethane foam insulation. NCFI supplied the polyurethane foam to Lowder.

NCFI provides product warnings in the following manner. It sends a First Order Letter to all new customers who order NCFI foam. The letter cautions that the information it provides "should be understood thoroughly by you and your personnel before applying spray-in-place urethane chemicals." It also includes the following articles: (1) Urethane Foam Contractors Association

(UFCA) Position Statement on "Sprayed Urethane Foam and Fire Safety"; (2) Society of the Plastics Industry (SPI) "Fire Safety Guidelines for the Use of Rigid Urethane Foam Insulation in Building Construction"; (3) SPI "Guide for the Safe Handling and Use of Urethane Foam Systems"; and (4) NCFI Material Safety Data Sheet–NCFI Gun Cleaner.[1]

NCFI did not provide this information to Lowder for the Dole job, however, because Lowder was not a new customer: He had received this information earlier that year when he had ordered polyurethane foam from NCFI for a different job. Lowder provided the general contractor with some, but not all, of the NCFI warnings.

Lowder applied NCFI foam to the walls and under the roof of the Dole addition. No thermal barrier was placed in direct contact with the NCFI foam. Wood-framed interior walls were constructed from one-half inch plywood covered with fiberglass, and there was an eight to twelve inch space between the plywood and the foam insulation.

During construction, a spark from a welding torch ignited a fire inside the wall. The gap between the foam and the plywood wall created a "chimney effect," spreading the fire quickly and causing substantial damage.

Dole's complaint claimed that NCFI failed to adequately warn of product hazards. Dole contended that NCFI did not warn that a thermal barrier must be in close contact with the polyurethane foam and did not warn that plywood is not an acceptable thermal barrier. Dole's claims included breach of warranty, negligence, and strict liability.

NCFI filed a motion for summary judgment based on three theories. It alleged that (1) its warnings were adequate, (2) it is relieved of liability by providing adequate warnings to a "sophisticated user" such as Lowder, and (3) Dole could not prove proximate cause. The court granted summary judgment in favor of NCFI without reaching the causation issue. It concluded that the warnings were adequate and NCFI satisfied

its duty to warn by warning Lowder. Dole appeals the entry of summary judgment except that it does not appeal the adverse judgment on its breach of warranty claim.

Dole raises three issues on appeal: (1) Did a question of fact exist as to the adequacy of NCFI's warnings? (2) Did NCFI satisfy its duty to warn by providing warnings to the subcontractor who installed the polyurethane foam? (3) Did Dole present sufficient evidence that NCFI's allegedly inadequate warnings proximately caused Dole's damages?

■ We review *de novo* an entry of summary judgment. *Gonzalez v. Satrustegui,* 178 Ariz. 92, 97, 870 P.2d 1188, 1193 (App.1993). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Orme School v. Reeves,* 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990). However, we must reverse and remand for a trial on the merits if reasonable inferences concerning material facts could be resolved in favor of either party. *United Bank of Arizona v. Allyn,* 167 Ariz. 191, 195, 805 P.2d 1012, 1016 (App.1990).

## I.

■ Dole argues that NCFI failed to warn that a thermal barrier must be in close contact with the foam and that plywood is an inadequate thermal barrier. "[B]oth negligence and strict liability standards impose a duty to produce products with appropriate warning instructions...." *Anguiano v. E.I. DuPont de Nemours & Co.,* 808 F.Supp. 719, 722 (D.Ariz.1992), *aff'd,* 44 F.3d 806 (9th Cir.1995).

■■ To establish a prima facie case of strict liability, the plaintiff must show "(1) the product is defective and unreasonably dangerous, (2) the defective condition existed at the time the product left the defendant's control, and (3) the defective condition is the proximate cause of the plaintiff's injuries." *Piper v. Bear Medical Systems, Inc.,* 180 Ariz. 170, 173, 883 P.2d 407, 410 (App.1993);

---

1. The pertinent portions of the instructions and warnings have been reprinted in the Appendix of this case.

*accord Gosewisch v. American Honda Motor Co.*, 153 Ariz. 400, 403, 737 P.2d 376, 379 (1987); Restatement (Second) of Torts § 402A (1965). A product may be unreasonably dangerous in the absence of adequate warnings. *Piper*, 180 Ariz. at 173–74, 883 P.2d at 410–11.

 "Determining whether a warning is adequate to apprise users of dangers in the product is ordinarily a question for the trier of fact." *Id.* at 177, 883 P.2d at 414. Based on the record, we cannot say as a matter of law that the warnings adequately conveyed the dangers posed by a space between the foam and the thermal barrier and the use of plywood as a thermal barrier. Dole's expert, Joseph Zicherman, testified that warnings should state the need for "a proper thermal barrier over the foam" and there should not be "gaps and large air spaces between the barrier and the foam." However, Zicherman admitted that in some instances plywood would be an appropriate barrier.[2]

NCFI argues that its warnings adequately conveyed the need for the barrier to be in *close contact* with the foam. NCFI relied on its warnings of the need to "cover" the foam with a barrier and to "always use a protective *coating* when applying sprayed urethane foam to the interior or exterior of a building*." NCFI claims this language "obviously" indicates a need for direct application. However, there is evidence to support the opposite inference: NCFI employee Ray Mackey testified that the NCFI literature does not address whether there can be a distance between the thermal barrier and the foam. If NCFI's own employees fail to glean this information from the literature, then it is not obvious. In addition, the warnings do not directly address the use of plywood as a barrier.

A reasonable jury could find that the warnings failed to adequately convey the dangers of using plywood as a thermal barrier and of leaving a space between the foam and the thermal barrier. Accordingly, summary judgment in favor of Dole is reversed.

## II.

 NCFI also contends that its duty to warn was satisfied even though Dole received no warnings. NCFI argues that it was enough to provide the information to a "sophisticated user" or "learned intermediary," such as the contractor who installed the foam.[3] Generally, warnings must be given to the ultimate user or consumer. Frumer & Friedman, *supra*, § 12.07 at 12–91. However, "[u]nder the 'learned intermediary doctrine,' 'the manufacturer's duty to warn is ordinarily satisfied if a proper warning is given to the specialized class of people that may prescribe or administer the product.'" *Davis v. Cessna Aircraft Corp.*, 182 Ariz. 26, 38, 893 P.2d 26, 38 (App.1994) (quoting *Piper*, 180 Ariz. at 178 n. 3, 883 P.2d at 415 n. 3); *accord Shell Oil Co. v. Gutierrez*, 119 Ariz. 426, 432–33, 581 P.2d 271, 277–78 (1978).

The Restatement describes this doctrine as follows:

> Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it. All sorts of

---

**2.** Another Dole expert, Brady Williamson, concluded that the warnings were inadequate to warn the end user. However, he did *not* specifically state how the warnings were inadequate.

Dole also claims NCFI employees established the inadequacy of the warnings. Although NCFI's technical sales representative, Ray Mackey, admitted that NCFI literature does not address the acceptability of plywood or of a space, he did not state that this rendered the warnings inadequate. Similarly, although Clarence Tolbert and Michael DeBone admitted that plywood

and gaps are unacceptable, they did not concede that the omission of this information rendered the warnings inadequate.

**3.** Many names have been applied to this doctrine, including "knowledgeable user defense" and "bulk supplier defense." Some courts distinguish them as separate, but they are essentially the same when applied to intermediaries between the seller and the end user. *See* 2 Louis R. Frumer & Melvin I. Friedman, Products Liability, § 12.07 at 12–94 (1995).

chattels may be supplied for the use of others, through all sorts of third persons under an infinite variety of circumstances. This being true, it is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe.

Restatement (Second) of Torts § 388 cmt. n (1965).[4]

■ To determine whether a manufacturer has satisfied its duty by warning a sophisticated intermediary, courts should consider the following factors:

[T]he likelihood or unlikelihood that harm will occur if the vendee does not pass on the warning to the ultimate user, the trivial or substantial nature of the probable harm, the probability or improbability that the particular vendee will not pass on the warning and the ease or burden of the giving of warning by the manufacturer to the ultimate user.

*Shell Oil*, 119 Ariz. at 433, 581 P.2d at 278 (following Restatement (Second) of Torts § 388 cmt. n).[5]

■ Whether a manufacturer has discharged his duty, considering these factors, is a question for the trier of fact. *Shell Oil*, 119 Ariz. at 434, 581 P.2d at 279. Considering the evidence in light of these factors, we find that a jury could conclude that NCFI's reliance on Lowder was unreasonable. We first consider the likelihood that Lowder would pass on the warning. NCFI's own employees thought it important that the end user know the dangers of polyurethane foam. However, NCFI made no effort to ensure that the intermediary transmitted information regarding the product's hazards to the end user. No evidence shows that Lowder previously relayed warnings, and in fact he did not relay the warnings on this occasion.

We next consider NCFI's burden in warning end users. NCFI argues that it cannot feasibly provide warnings to end users. NCFI generally sells to contractors who apply the foam insulation; it rarely has contact with end users.

On the other hand, NCFI's sales staff is often on the job site. NCFI also requires that its sales staff visit jobs when new customers are using the foam for the first time.

4. Although this Restatement provision addresses a negligent failure to warn, the majority—and better-reasoned—view is that it applies equally to a strict liability claim. *See* Frumer & Friedman, *supra*, § 12.07 at 12–101, § 12.02 at 12–9, 12–10; *Higgins v. E.I. DuPont de Nemours & Co.*, 671 F.Supp. 1055, 1059–60 (D.Md.1987).

5. NCFI urges this Court to reject the Restatement in favor of the "duty approach," under which a manufacturer has no duty to warn an end user if it provides adequate warnings to a knowledgeable intermediary. This approach presumes that the intermediary will pass on the information, while the Restatement considers the reasonableness of the manufacturer's reliance that the intermediary will do so. *See O'Neal v. Celanese Corp.*, 10 F.3d 249, 253 n. 2 (4th Cir. 1993).

Division Two of this Court followed Restatement section 388, comment n in *Shell Oil*, 119 Ariz. at 433–34, 581 P.2d at 278–79. We are unpersuaded to depart from *Shell Oil*. NCFI's argument that we do so consists of three assertions. First, it states that the duty rule encourages sellers to warn intermediaries. However, the Restatement rule also encourages sellers to

warn intermediaries, and any greater incentive to do so offered by the duty rule is offset by its disadvantages, the principal one of which is that it drastically reduces the incentive for sellers to notify end users. An important source of product warnings is thereby virtually eliminated.

The second alleged advantage of the duty approach is that it encourages intermediaries to warn end users. However, the duty rule does not affect the intermediary's duty. If the intermediary is itself a seller of the product, it has the duty to warn its customers under the Restatement. If the intermediary is instead an employer, its behavior is governed by the workers' compensation scheme under both the duty and the Restatement approaches.

The third and final assertion is that the duty rule relieves sellers of the "nearly impossible and costly task" of identifying and warning end users. This argument overlooks important points. First, when notification is truly impractical, the Restatement does not impose liability. Second, notification is often not impractical. For example, an automobile manufacturer can include consumer warnings in owner's manuals and on vehicle components when it sells vehicles to dealers.

NCFI also has an inspection system in place under which it inspects before and after each application of its product to a roof. Personal contact with the ultimate consumer is thus an available avenue of communication. "[T]he burden of [warning the ultimate user] is slight ... when the chattel is to be used in the presence or vicinity of the person supplying it, so that he could easily give a personal warning to those who are to use the chattel." Restatement (Second) of Torts § 388 cmt. n. NCFI can also ask its customers to identify the end users and simply mail the information. Finally, the number of end users is relatively small. This contrasts markedly with the cases cited by NCFI—and discussed below—in which many employees or other end users were involved. Thus, it is at least debatable whether NCFI could practicably contact the end user to provide warnings. Accordingly, this is a jury question and is not susceptible to summary judgment.

NCFI cites *Adams v. Union Carbide Corp.*, 737 F.2d 1453 (6th Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), contending that it shows NCFI fulfilled any duty by warning its customer. In *Adams*, plaintiff claimed that Union Carbide, which had supplied toluene diisocyanate (TDI) to General Motors (GM), did not warn GM employees of the chemical's dangerous propensities. Union Carbide had provided the chemical in bulk to GM, where it was mixed with other chemicals. GM had exclusive control over the chemical and the GM employees who came in contact with it. The court concluded that "in light of GM[ ]'s duty to safeguard its employees' health and in consideration of the fact that comprehensive information concerning the use of TDI was conveyed by Union Carbide to GM[ ] for the express purpose of dissemination to GM[ ]'s employees[,]" Union Carbide fulfilled its duty as a matter of law. *Id.* at 1457.

This case differs significantly. NCFI did not provide warnings to Lowder "for the express purpose of dissemination" to Dole. In fact, NCFI admits that it did not ask that warnings be forwarded to Dole. *See In re Brooklyn Navy Yard Asbestos Litigation*, 971 F.2d 831, 838 (2d Cir.1992) (court rejected sophisticated intermediary defense where

no evidence showed that the manufacturer actually relied on the intermediary to warn end user). Furthermore, in *Adams*, GM remained in contact with and in control of the people who interacted with the chemical. Thus, it was reasonable for the manufacturer to rely on GM to convey warnings to its employees. Conversely, the insulation subcontractor here had no control over Dole or other contractors and their workers who came in contact with the foam insulation. We decline to hold that NCFI's alleged reliance on the contractor was reasonable as a matter of law.

NCFI also relies on *Sara Lee Corp. v. Homasote Co.*, 719 F.Supp. 417, 424 (D.Md. 1989). The product in *Sara Lee*, expandable polystyrene beads, was sold as a raw material that was converted into an insulation board and then sold to hardware stores. Because of the change in form of the original product, the court concluded that the sophisticated purchaser of the raw material, who had transformed it into another product, was in the best position to warn the end user: The manufacturer was not in a position to identify and warn consumers and "could not feasibly place a warning" on the product that would reach the end user. *Id.* at 424.

Although NCFI placed warnings on the drums it sent to the contractor, it could not feasibly place warnings on the sprayed foam. However, this is only one consideration, and we cannot conclude as a matter of law that NCFI's reliance was reasonable on this basis alone. *See Shell Oil*, 119 Ariz. at 434, 581 P.2d at 279 ("Lack of access to the final form in which the product reaches the user is simply one of the considerations bearing upon the existence and extent of duty."). There are methods of conveying warnings other than placing them on the product.

■■■ Another factor in deciding whether warning an intermediary is adequate is the nature of the potential harm. While NCFI concedes that the potential damage was great, it claims that the likelihood of harm was small. The risk supposedly was minimized by NCFI's detailed warnings to the intermediary and Dole's reliance on the intermediary's expertise. NCFI's argument misconstrues the probability question. The

relevant question is the potential for harm *if the warnings are not conveyed to the end user. See* Restatement (Second) of Torts § 388 cmt. n. Moreover, the Restatement factors include both the likelihood and severity of the harm. Damage of potentially great severity but lesser likelihood of occurrence may warrant precautions equal to those taken to avoid harm of greater probability but lesser severity. *See generally United States v. Carroll Towing,* 159 F.2d 169 (2d Cir.1947) (Hand, J.). There is sufficient evidence for a jury to conclude that the risk of potential harm was enough to require warnings.

A reasonable jury could conclude that NCFI's duty to warn was not discharged by warning the intermediary and this issue cannot be decided as a matter of law. *See Shell Oil,* 119 Ariz. at 434, 581 P.2d at 279 ("The determination as to whether the supplier's duty measured by these considerations has been reasonably discharged comes within the function of the trier of fact."). Accordingly, we reverse the summary judgment.

### III.

 The final issue in this case is whether Dole had evidence that the failure to warn caused the loss. What is required is "evidence that had a proper warning been given, he would not have used the product in the manner which resulted in his injury, or by evidence that certain precautions would have been taken that would have avoided the accident." *Gosewisch,* 153 Ariz. at 403, 737 P.2d at 379 (citation omitted). Although Dole presented evidence that there was a reasonable probability that the addition could have been saved if the foam had been properly protected, Dole presented no evidence that it would have heeded adequate warnings.

 Dole argues that this omission is not fatal because a rebuttable presumption arises that it would have heeded the warning. The Restatement provides: "[W]here warning is

given, the seller may reasonably assume that it will be read and heeded...." Restatement (Second) of Torts § 402A cmt. j. The presumption works both ways: It works in favor of the seller when an adequate warning is given, but favors the plaintiff when an adequate warning is not given. Most jurisdictions have applied the rebuttable presumption to the benefit of plaintiffs. *See, e.g., Knowlton v. Deseret Medical, Inc.,* 930 F.2d 116, 123 (1st Cir.1991); *Plummer v. Lederle Laboratories,* 819 F.2d 349, 355–56 (2d Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987); *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1281 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Petty v. United States,* 740 F.2d 1428, 1438–39 (8th Cir.1984); *Seley v. G.D. Searle & Co.,* 67 Ohio St.2d 192, 423 N.E.2d 831, 838 (1981).

Arizona decisions that have addressed this presumption did not adopt it because the evidence in those cases rebutted the presumption as a matter of law. In *Gosewisch,* for example, the Arizona Supreme Court determined that the undisputed evidence showed that the plaintiff would have ignored any further warning, as he had with the existing warnings not to carry passengers and to always wear a helmet. The court therefore concluded that the presumption would have been rebutted as a matter of law. *Gosewisch,* 153 Ariz. at 404, 737 P.2d at 380.[6]

As in *Gosewisch,* Dole failed to provide testimony that it would have taken precautions had an adequate warning been given. Unlike *Gosewisch,* however, the evidence on whether Dole ignored existing warnings is disputed. For example, the evidence shows Dole relied on the information provided by the general contractor and a Yuma building official. NCFI presented evidence calling into question Dole's reliance on this advice. The construction plans for the prior 1990 construction project had called for application of a spray-applied one-quarter inch fire

---

6. Likewise, Division Two declined to adopt the presumption in *Sheehan v. Pima County,* 135 Ariz. 235, 238, 660 P.2d 486, 489 (App.1982), because it concluded that the presumption would have been rebutted as a matter of law. The evidence showed that there was a one in five million chance of contracting contact polio from a polio vaccine, that no other vaccine was readily available, and that the vaccine was recommended by the government. *Id.* The court, however, indicated that the presumption might apply in a case in which the warnings describe an action that, if taken, would easily prevent the possible harm. *Id.*

retardant barrier over the foam. Upon approval from the Yuma City Building Official, this barrier was omitted. Upon learning of this, some subcontractors voiced objections, but the objections were disregarded. The 1992 plans also omitted a spray-applied thermal coating over the NCFI foam, but the City of Yuma approved the plans without the barrier. Given official approval of the construction, it would be reasonable to find that Dole's failure to include the barrier was justified. The evidence does not show beyond dispute that Dole would have ignored adequate warnings from NCFI.

NCFI also points to a fire during the 1990 construction project. Welding sparks ignited foam insulation not covered by a thermal barrier. However, this fire occurred while the foam was being applied and before any barrier was installed. Thus, the 1990 fire involved no inadequacies in barrier material or spacing. That fire would not necessarily notify Dole either that plywood was an inappropriate barrier or that there should be no space between the barrier and the foam. We cannot conclude as a matter of law that the evidence rebutted the presumption that Dole would have taken precautions.[7]

■ Absent contrary precedent, Arizona courts follow the Restatement. *Aztlan Lodge No. 1 v. Ruffner*, 155 Ariz. 163, 165, 745 P.2d 611, 613 (App.1987). The courts in *Gosewisch* and *Sheehan* declined to apply the presumption because it would have been rebutted by the evidence as a matter of law. The same cannot be said in the present case. We follow the Restatement and hold that Dole is entitled to the presumption that the warning would have been read and heeded if it had been given.

The effect of the presumption is to take the case to the jury, even in the face of NCFI's contrary evidence. This is so because a reasonable jury could still infer that Dole would have heeded adequate warnings because NCFI's evidence did not show that

Dole received clear and adequate warnings or that Dole's conduct was clearly unreasonable. Thus, the presumption does not dissipate in the face of contrary evidence. *See generally 2 McCormick on Evidence*, § 344 at 462–63 (John W. Strong, ed., 4th ed.1992). Moreover, the presumption shifts the burden of proof to NCFI, and it is up to the jury to determine whether the burden has been satisfied. *See id.* at 460. Accordingly, this issue must be decided by the jury and is not susceptible to summary judgment.

Finally, NCFI argues that it is not liable because the fire started in an area in which the foam was manufactured by someone else, although NCFI's foam admittedly burned in the fire. However, Dole "need only present probable facts from which a causal relationship reasonably may be inferred." *Robertson v. Sixpence Inns of America*, 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990). Dole's expert testified that improperly protected NCFI foam contributed to the speed of the fire and degree of damage. This evidence is sufficient to prevent summary judgment and warrant a trial.

## CONCLUSION

We hold that disputed issues of material fact exist regarding the adequacy of the warnings, the application of the knowledgeable intermediary defense, and causation. Accordingly, we reverse the summary judgment and remand for further proceedings.

FIDEL, P.J., and SULT, J., concur.

## APPENDIX

The UFCA Position Statement on "Sprayed Urethane Foam and Fire Safety" included the following statements:

The classification or representation of any urethane foams as self-extinguishing, non-burning, or slow-burning is not a valid statement based upon information presently available.... Potential fire hazard may

---

7. NCFI also argues the presumption is rebutted because it is common construction practice for the general contractor to provide warnings and instructions to the building owner at the time of occupancy. However, this argument was not presented in NCFI's motion for summary judg-

ment, although the testimony on which the argument is based was attached to the reply memorandum. We decline to consider a new argument on appeal. *See Stewart v. Mutual of Omaha Ins. Co.*, 169 Ariz. 99, 108, 817 P.2d 44, 53 (App.1991).

exist when sprayed urethane foam surfaces remain unprotected in confined areas with limited air access. Serious flash fires result from usage of exposed and unprotected sprayed urethane foam systems....

When unprotected cured urethane is exposed to a vigorous fire source such as a welding or cutting torch or red hot metal, the foam will usually burn on the surface area....

It is essential that the applicator understand and practice proper safety precautions including:

1. Always use a protective coating when applying sprayed urethane foam to the interior or exterior of a building.

2.... Promptly apply an "ignition barrier" on interior applications. (See following note of special importance.)

3. Proper surface protection must be used whenever welding or cutting near surfaces sprayed with urethane foam, and then only under controlled conditions.

4. Flame and excessive heat should be avoided.

5. Avoid confined storage of finished sprayed urethane foam products.

. . . . .

9. Practice the safety guidelines of the Society of the Plastics Industry, and the Urethane Foam Contractors Association.

**NOTE OF SPECIAL IMPORTANCE**

When combustible material in an interior space becomes ignited, radiating substantial heat to the foam, auto-ignition of the foam can occur if the temperature upper limits are reached. Accordingly, where the foam is in an interior space, rated, tested and approved "ignition barriers" must be applied to that side of the foam on the habitable side of the structure as an effective deterrent against ignition of the foam resulting from a substantial heat build-up. The following check lists are provided as a safety guide:

*Flame sources to be avoided include:* 1. Welding and flame cutting, either electric or torch....

*Stored or accumulated flammable materials to be avoided:* ... Flammable solids, such as paper, wood....

There is presently available a variety of products that are generally acceptable as proper "ignition barriers." These products include such generically different materials as gypsum wallboard, sprayed cementitious, certain sprayed celluloses, and portland cement plaster. Acceptability of the "ignition barrier" should be based on approval by the building code agency. It is important that the reader realize that the degree of exposure such as degree of hazard involved in the usage of the room or building is most significant in determining the proper "ignition barrier" protection.... The generic choice of usage of these "ignition barriers" should be made judiciously, for each has its own individual merits and attributes.

All model building codes required an approved "ignition barrier," which is referenced in the codes as a thermal barrier on the habitable side of a structure between the interior of the structure and the foam plastic insulation.

A code definition of approved "thermal barrier" is a material equal in fire resistance to one half inch gypsum board. Such "thermal barriers" are those that limit the temperature rise of the unexposed surface to not more than 250 degrees F. after 15 minutes of fire exposure complying with the ASTM E–119 standard time-temperature curve and remain in place during these test conditions.

An SPI publication entitled, "Fire Safety Guidelines for Use of Rigid Polyurethane Foam Insulation for Building Construction," provided:

### POLYURETHANE FOAM AND COMBUSTIBILITY

At the present stage of development, all organic foams, whether they contain fire retardants or not, should be considered combustible and handled accordingly. Experience demonstrates that certain precautions must be taken to minimize the fire hazard in handling, storage and use.

*How polyurethane is used in a building system ultimately determines its fire safety. Exposed polyurethane foam must be protected from accidental ignition by completely covering it with a flame barrier as soon as possible after installation, preferably the same day. Sprinkler protection may also be desirable.*

## SAFETY DURING CONSTRUCTION

Fire is a serious concern during construction. Good practices suggest the following safety precautions: ... 2. Prohibit open flames, cutting and welding torches, electric heaters, high intensity lamps, and smoking materials, such as cigarettes, pipes and cigars, from foam storage and installation areas. If hot work must be done near exposed polyurethane, shield the foam from heat and sparks by a thermal barrier such as asbestos cement board. A fire watch is desirable. Do not weld or cut metal which is in contact with polyurethane....

## SAFETY IN DESIGN

... The most important consideration is to make sure that a suitable flame barrier covers all surfaces of polyurethane foam insulation. Additionally, certain applications may require sprinkler protection. Local building code and fire code officials, insurers, and manufacturers' specifications and installation instruction should be checked in each specific instance....

Following are some fire safety design guides for the architect and contractors based on these model codes and recommendations of the Urethane Safety Group.

**For Interior Use**

1. Polyurethane foam used in all interior wall and/or ceiling construction or concealed spaces should not be left exposed but should be covered with at least 1/2 inch of cement plaster or fire rated gypsum wallboard or an equivalent 15-minute thermal barrier.

2. Polyurethane foam installed above a suspended ceiling, such as in a refrigerated building requires protection by a thermal barrier above the foam, i.e., between the top side of the foam and the underside of the floor above. The result should be a thermal barrier on both sides of the foam....

5. Fire stops should be provided for large warehouse ceiling areas, between floors in multi-story buildings, in concealed spaces, and at penetrations into pipe chases and ventilation shafts.

(Emphasis in original).

The product drums contained the following warnings:

### IMPORTANT NOTICE

Urethane foam produced from these chemicals is combustible.

If exposed to fire, such as welding and cutting torches, it may constitute a fire hazard. Where foam is sprayed over large areas of building interiors, especially underside of ceilings, its exposed surface should be covered with ½" portland cement plaster or equivalent to protect from fire. For prediction of fire hazard in construction, refer to "factory mutual loss prevention date—polyurethane insulation 1–57".

An SPI article entitled, "Guide for the Safe Handling and Use of Polyurethane and Polyisocyanurate Foam Systems," provided the following warnings under the heading "COMBUSTIBILITY":

Polyurethane foams used as insulation require thermal protection from fire on the interior, such as one-half inch gypsum wall board or the equivalent, unless fire testing demonstrates such thermal barriers are not needed. Consult local building codes to determine applicable restrictions. Additionally, because polyurethane foams must generally be covered on the exterior with a coating or some other weather-resistant covering, applicators should follow the fire protection measures discussed above, or those provided by the supplier of the foam or covering material.

The NCFI Material Data Sheet included the following warning on the first page:

**CAUTION:** Urethane foam produced from these chemicals may present a risk of fire in certain applica-

tions if exposed to excessive heat and oxygen, i.e. welding and cutting torches. See reverse side for prediction of fire hazard and guide for safe application.

The reverse side contained the following information:

**PREDICTION OF FIRE HAZARD IN CONSTRUCTION**

Where foam is sprayed over large areas of building interiors its exposed surface should be protected from fire hazard by ½″ portland cement plaster or ½″ gypsum board or equivalent. . . .