### In re ZYPREXA PRODUCTS LIABILITY LITIGATION.

**James Head, in Yolanda Chavez, et al., Plaintiffs,**

v.

**Eli Lilly & Company, Defendant.**

Nos. 04–MD–1596 (JBW), 06–CV–2592 (JBW).

United States District Court, E.D. New York.

July 31, 2009.

Samuel R. Bagenstos, Washington University Law School, St. Louis, MO, Allan Berger, Allan Berger & Associates, P.L.C., New Orleans, LA, Andrew S. Penn, Bazelon Center for Mental Health Law, Washington, DC, Eleanor L. Polimeni, Finkelstein & Partners, Newburgh, NY, Lawrence J. Gornick, Levin Simes Kaiser & Gornick LLP, San Francisco, CA, Marc Steven Albert, Seeger Weiss LLP, Samuel J. Abate, Jr., Pepper Hamilton LLP, New York, NY, for Zyprexa Products Liability Litigation.

## MEMORANDUM, ORDER & JUDGMENT

JACK B. WEINSTEIN, Senior District Judge:

## Table of Contents

I.  Introduction .................................................................. 20

II. History of Zyprexa Litigation ............................................ 21

III. Facts ......................................................................... 24
    A.  Contents and Use of Zyprexa ......................................... 24
    B.  Labeling and Warnings to Patients and Medical Professionals ..... 24
        1.  FDA Labeling and "Dear Doctor Letter" ......................... 24
        2.  Consensus Statement of American Diabetes Association and Other Learned Groups ................................................. 26
        3.  FDA March 2007 Letter ........................................... 27
        4.  Findings on Medical Community's Knowledge of Zyprexa's Risks .......... 27
    C.  Plaintiff's Medical History and Physicians' Knowledge of Zyprexa's Effects ................................................................. 28
        1.  Psychiatric and Medical History ................................. 28
        2.  Prescribing Physicians' Knowledge of Zyprexa's Risks .......... 30

IV. Law ........................................................................... 30
    A.  Summary Judgment Standard ......................................... 30
    B.  Choice of Law ........................................................ 31
    C.  Learned Intermediary Doctrine ...................................... 31

V.  Application of Law to Facts .............................................. 32
    A.  Expert Testimony of Dr. Stephen J. Hamburger ..................... 32
    B.  No Proximate Causation as to Prescription and Injury ............. 33

VI. Conclusion ................................................................. 33

## I.  Introduction

Defendant Eli Lilly & Company ("Lilly") moves for summary judgment against plaintiff James Head. Plaintiff commenced this action against Lilly in April 2006, in the United States District Court for the District of Arizona. The case was transferred to the Eastern District of New York pursuant to an order of the Judicial Panel on Multidistrict Litigation. Eight causes of action are asserted, all of which rest on the basic claim that Lilly failed to warn about the risks of Zyprexa. It is alleged by plaintiff that: (1) Zyprexa, a drug produced by Lilly, caused diabetes; (2) Lilly failed to warn of the risks of weight gain and other metabolic dangers of Zyprexa; and (3) Zyprexa would not have been prescribed, and diabetes would not have been suffered, if proper and full warnings had been given.

Lilly moves for summary judgment, contending that no further warning would

have changed the decision to prescribe Zyprexa for Head. Lilly submits that operation of the learned intermediary doctrine prevents a finding of causation. Full briefing and, on July 31, 2009, oral argument has taken place.

For the reasons stated below, defendant's motion for summary judgment is granted.

## II.  History of Zyprexa Litigation

This massive and highly complex multidistrict litigation has included claims brought by individual Zyprexa users, states, third-party payors, and other entities alleging physical or financial injury. Some 30,000 cases have been brought against Lilly by individual plaintiffs suffering from serious psychiatric problems who were treated with the Lilly antipsychotic drug Zyprexa. They principally allege that Zyprexa caused deleterious side effects of excessive weight gain, hyperglycemia, and diabetes; that Lilly misled them and their physicians about the likelihood of these side effects; and that, had they or their attending physicians been aware of the risks, they would not have taken Zyprexa.

Litigation against Lilly for injuries allegedly caused by Zyprexa was initiated in this court in March 2004. *See Benjamin v. Eli Lilly & Co.*, No. 04–CV–893. Thousands of cases were then transferred here from federal district courts throughout the United States pursuant to an order of the Judicial Panel on Multidistrict Litigation. *See* Letter from Multidistrict Litigation Panel to Clerk of the Eastern District of New York, No. 04–MD–1596, Docket Entry No. 1, Apr. 14, 2004. Similar cases have been litigated in state courts. *See In re Zyprexa Prods. Liab. Litig.*, 239 F.R.D. 316 (E.D.N.Y.2007) ("Memorandum on Cooperation Between Federal and State Judges").

The individual Zyprexa user litigation has been administered as a quasi-class action. *See In re Zyprexa Prods. Liab. Litig*, 467 F.Supp.2d 256, 262 (E.D.N.Y.2006) ("The court, magistrate judge and special masters will continue to administer this litigation as a quasi-class action."); *In re Zyprexa Prods. Liab. Litig.*, 451 F.Supp.2d 458, 477 (E.D.N.Y.2006) ("Recognizing its obligation to exercise careful oversight of this national 'quasi-class action,' the court has already utilized its equitable power to limit attorneys' fees and costs.") (citation omitted); *In re Zyprexa Prods. Liab. Litig.*, 433 F.Supp.2d 268, 271 (E.D.N.Y.2006) (finding that individual Zyprexa user litigation "may be characterized properly as a quasi-class action subject to the general equitable power of the court"); *In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488, 491 (E.D.N.Y. 2006) (same); *In re Zyprexa Prods. Liab. Litig.*, 233 F.R.D. 122, 122 (E.D.N.Y.2006) (same).

Cooperation between federal and state courts has been encouraged at all stages of the *Zyprexa* litigation. *See, e.g., In re Zyprexa Prods. Liab. Litig.*, 467 F.Supp.2d at 262 ("Cooperation with state courts will continue to be stressed."); *In re Zyprexa Prod. Liab. Litig.*, No. 04–MD–1596, 2006 WL 898105, at *1 (E.D.N.Y. Apr. 16, 2006) ("Coordination and cooperation between state and federal courts has been encouraged."); *In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2006 WL 197151 (E.D.N.Y. Jan. 30, 2006) (letter to state judges with Zyprexa cases suggesting coordination and cooperation); *In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2004 WL 3520248, at *4 (E.D.N.Y. Aug. 18, 2004) (directing defendant Lilly and Plaintiffs' Steering Committee I to "confer regarding procedures for coordination of state court discovery with discovery in this MDL").

A national system for resolving Medicare and Medicaid liens was approved. *See In re Zyprexa Prods. Liab. Litig.*, 451 F.Supp.2d 458 (E.D.N.Y.2006). All states and the federal government agreed to modify their lien demands to provide a national equitable system. *See In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2006 WL 3501263, at *1 (E.D.N.Y. Dec. 4, 2006) ("In compliance with this court's instructions . . . all fifty states as well as the federal government have resolved their Medicare and Medicaid liens.") (citation omitted).

On April 16, 2004, a class action was filed on behalf of individuals claiming personal injury based on, among other claims, Lilly's failure to provide an adequate warning about the risks of Zyprexa. *See Ortiz v. Eli Lilly & Company,* No. 04–CV–1587 (E.D.N.Y.). A second and substantially similar class action was filed in this court on May 19, 2004. *See Tringali v. Eli Lilly & Company,* No. 04–CV–2104 (E.D.N.Y.). On September 15, 2004, Lilly and plaintiffs' counsel in the two putative class actions entered into an agreement to execute stipulations of dismissal of the class actions, with the effective date of dismissal to be November 1, 2004, or 167 days after the *Ortiz* action was filed. *See* Joint Memorandum of the Parties Regarding Stipulation of Voluntary Dismissal of Certain Claims, No. 04–MD–1596, Docket Entry No. 80, Attach. 2.

Discovery and negotiations were overseen in part by a court-appointed special discovery master and four special settlement masters. In November 2005, Lilly, without conceding liability, entered into a settlement covering some 8,000 individual plaintiffs. *See In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2005 WL 3117302 (E.D.N.Y. Nov. 22, 2005). The settlement resolved virtually all cases then pending in the MDL, along with some state cases. *See id.*

An attorneys' fee structure for many cases was ordered, capping fees at 20% of recovery in smaller, lump-sum claims, and at 35% of recovery in other claims. *See In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488 (E.D.N.Y.2006). Costs related to the individual cases and charged to individual settling plaintiffs were limited. *See In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2006 WL 2443248 (E.D.N.Y. Aug. 24, 2006). Counsel for some 2,000 individual plaintiffs filed an appeal of an order capping fees, *see In re Zyprexa Prods. Liab. Litig,* No. 04–MD–1596, 2007 WL 2340789 (E.D.N.Y. Aug. 17, 2007), which is now pending before the Court of Appeals for the Second Circuit. The magistrate judge allocated funds from a first common benefit fund after reviewing the first Plaintiffs' Steering Committee's ("PSC I") applications. *See In re Zyprexa Prods. Liab. Litig,* No. 04–MD–1596, 2007 WL 805793 (E.D.N.Y. Mar. 15, 2007). Allocation of funds has been substantially completed for PSC I.

Following an influx of thousands of new cases, in January 2007 the parties announced another round of settlements, which are nearing completion. A second common benefit fund was established to compensate members of a second PSC for their work. *See In re Zyprexa Prods. Liab. Litig.*, 467 F.Supp.2d at 262.

Four motions for summary judgment by Lilly in individual *Zyprexa* cases were decided in June 2007. Three of those motions were denied and one was granted based on application of the statute of limitations, which barred that plaintiff's claim. *See Souther, et al. v. Eli Lilly & Co.*, 489 F.Supp.2d 230 (E.D.N.Y.2007).

A class action has been brought on behalf of third-party payor institutional plaintiffs that include pension funds, labor

unions, and insurance companies that cover their members' health benefits; they have covered payments for Zyprexa prescriptions. Mail fraud under the Racketeer Influenced and Corrupt Organizations Act ("RICO") is alleged, *see* 18 U.S.C. § 1964, predicated on overpricing supported by excessive claims of utility as well as disavowal of adverse secondary effects of the drug, primarily weight gain and diabetes. That class has been certified. *See In re Zyprexa Prods. Liab. Litig,* 253 F.R.D. 69, 201 (E.D.N.Y.2008). Individual plaintiffs who bought, or paid a portion of the purchase price for, Zyprexa for their own use also sought class action status on a similar theory. Certification of this individual payor class action was denied. *See id.* at 201–02.

Many state attorneys general have sued on behalf of their states' citizens seeking reimbursement for overpayments for Zyprexa made with state and federal funds via state Medicaid programs and other remedies based upon state law grounds. Currently pending in this court are actions on behalf of the citizens of nine states. A putative *qui tam* action by a whistleblower representing California was dismissed. Order, *California ex rel. Jaydeen Vincente v. Eli Lilly & Co.,* Apr. 23, 2008, No. 08–CV–600, Docket Entry No. 84 (E.D.N.Y.). The case originating in this district, brought by the state of Connecticut, will be tried in November 2009 if it has not been settled or dismissed before that date. *See* Order, Apr. 21, 2009, No. 08–CV–955, Docket Entry No. 205. Motions for summary judgment in other state attorney general cases before this court will be heard in fall 2009. *See* Case Management Order No. 6, No. 04–MD–1596, Docket Entry No.2092, Mar. 13, 2009.

In March 2008, Lilly reportedly settled with the state of Alaska during trial in a related case. *See* Alex Berenson, *Alaska Suit Against Lilly Is Settled,* N.Y. Times, Mar. 26, 2008, at C1 (reporting the settlement agreement reached after three weeks of trial before the case went to the jury). That state's lawsuit sought reimbursement for the medical costs of Alaska Medicaid patients who developed diabetes while taking Zyprexa; the state's claim to recover costs associated with Lilly's off-label promotion of Zyprexa was dismissed before trial. *See* Alex Berenson, *Lilly Executive Discussed Off–Label Uses for Drug,* N.Y. Times, Mar. 15, 2008, at C1. Some of the materials introduced in that trial are available as part of the public record. Other *Zyprexa* settlements have followed. *See* Alex Berenson, *33 States to Get $62 Million in Zyprexa Case Settlement,* N.Y. Times, Oct. 7, 2008, at B7.

Some of Lilly's shareholders have filed suit because of the decline in share price. *See In re Eli Lilly & Co. Securities Litig.,* No. 07–CV–1310 (E.D.N.Y.). This litigation has been dismissed on statute of limitations grounds. *See In re Zyprexa Prods. Liab. Litig.,* 549 F.Supp.2d 496 (E.D.N.Y.2008).

Current shareholders have sued in this court in the form of three separate shareholder derivative actions. *See Waldman v. Taurel,* No. 08–CV–560 (E.D.N.Y.); *City of Taylor Employees Retirement System v. Taurel,* No. 08–CV–1554 (E.D.N.Y.); *Robins v. Taurel,* No. 08–CV–1471 (E.D.N.Y.). Similar cases are pending in other courts. Settlement negotiations are ongoing.

Additional cases transferred to the multidistrict litigation are being managed by a special master, who is tracking settlements, setting timelines for discovery and the adjudication of dispositive motions, and scheduling trial dates. *See* Case Management Order No. 32, 04–MD–1596, Docket Entry No. 2072, Mar. 3, 2009. Several cases originally set for trial have been

settled or withdrawn. Individual actions originating in the Eastern District of New York have been placed on an expedited discovery and motion schedule so that trial on those actions may, if necessary, move forward without undue delay.

A series of summary judgment motions by Lilly in individual Zyprexa user actions are now pending. The court has ruled on the parties' *Daubert* motions challenging proposed expert testimony in a number of these and other cases. *See In re Zyprexa Prods. Liab. Litig.*, 04–MD–1596, 2009 WL 1357236 (E.D.N.Y. May 12, 2009) (ordering the exclusion of plaintiffs' proposed expert testimony in twenty cases); *see In re Zyprexa Prods. Liab. Litig.*, 04–MD–1596, 2009 WL 1322286, (E.D.N.Y. May 12, 2009) (approving plaintiffs' proposed expert testimony in two cases); *In re Zyprexa Prods. Liab. Litig.*, 04–MD–1596, 2009 WL 1322292 (E.D.N.Y. May 12, 2009) (approving defendant's proposed expert testimony); *Souther*, 489 F.Supp.2d at 281–91 (denying plaintiffs' and defendant's *Daubert* motions to exclude expert testimony).

## III. Facts

### A. *Contents and Use of Zyprexa*

Zyprexa's active ingredient is olanzapine, one of a class of medications known as "atypical" or "second generation" antipsychotics. It was approved for use in treating schizophrenia and acute manic episodes associated with bipolar disorder by the United States Food and Drug Administration ("FDA") in 1996. In 2004, the FDA also approved Zyprexa for the treatment of bipolar disorder generally.

### B. *Labeling and Warnings to Patients and Medical Professionals*
#### 1. *FDA Labeling and "Dear Doctor Letter"*

The 1996 Zyprexa package insert accompanying the drug disclosed information about possible side effects of administration of olanzapine based on clinical trials. The insert provided, in part, the following information:

*Adverse Events Occurring at an Incidence of 1% or More Among Olanzapine–Treated Patients in Short–Term, Placebo–Controlled Trials*—[The tables] enumerate[ ] the incidence, rounded to the nearest percent, of treatment-emergent adverse events that occurred during acute therapy (up to 6 weeks) of schizophrenia in 1% or more of patients treated with olanzapine (doses ≥ 2.5 mg. /day) where the incidence in patients treated with olanzapine was greater than the incidence in placebo-treated patients.

The prescriber should be aware that the figures in the tables and tabulations cannot be used to predict the incidence of side effects in the course of usual medical practice where patient characteristics and other factors differ from those that prevailed in the clinical trials. Similarly, the cited frequencies cannot be compared with figures obtained from other clinical investigations involving different treatments, uses, and investigators. The cited figures, however, do provide the prescribing physician with some basis for estimating the relative contribution of drug and nondrug factors to the side effect incidence in the population studies.

Zyprexa Package Insert, dated October 1, 1996, at 11 (emphasis in original).

Two tables in the insert provided the results of placebo-controlled clinical studies of olanzapine-treated patients. The data indicates that, over a six-week administration of Zyprexa, six percent of olanzapine-treated patients reported weight gain, while only one percent of the placebo-

treated patients reported weight gain. *Id.* at 12–16.

For several years, this information on the insert remained substantially the same insofar as it provided physicians information on reported weight gain-related adverse events. During this period, the results of longer-term studies and clinical experience with Zyprexa and competing drugs became widely known. *See* Part III.B.IV, *infra.*

In May 2000, the FDA undertook an analysis of the incidence of diabetes and hyperglycemia in patients using atypical antipsychotics. The director of the FDA's Division of Neuropharmalogical Drug Products requested additional safety information about Zyprexa from Lilly. In its letter, the FDA cited post-marketing reports of diabetes-related adverse events associated with Zyprexa use. In response, Lilly provided the FDA with clinical studies, data analysis, and case report reviews. The parties disagree about whether the information given by Lilly to the FDA was complete and accurate.

On September 11, 2003, the FDA announced it would require a warning about risks of hyperglycemia and diabetes mellitus and treating precautions to appear in the package insert of all atypical antipsychotics, including Zyprexa. Designed for prescribing doctors, the label noted that epidemiological studies and other information indicated that the relationship between the drug and hyperglycemia and diabetes was not yet fully understood. It reads as follows:

WARNINGS

Hyperglycemia and Diabetes Mellitus

Hyperglycemia, in some cases extreme and associated with ketoacidosis or hypersomolar coma or death has been reported in patients treated with atypical antipsychotics including Zyprexa. Assessment of the relationship between atypical antipsychotic use and glucose abnormalities is complicated by the possibility of an increased background risk of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes mellitus in the general population. Given these confounders, the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood. However, epidemiological studies suggest an increased risk of treatment-emergent hyperglycemia-related adverse events in patients treated with the atypical antipsychotics studied. Precise risk estimates for hyperglycemia-related adverse events in patients treated with atypical antipsychotics are not available. . . .

Patients with an established diagnosis of diabetes mellitus who are started on atypical antipsychotics should be monitored regularly for worsening of glucose control. Patients with risk factors for diabetes mellitus (e.g., obesity, family history of diabetes) who are starting treatment with atypical antipsychotics should undergo fasting blood glucose testing at the beginning of treatment and periodically during treatment. Any patient treated with atypical antipsychotics should be monitored for symptoms of hyperglycemia including polydipsia, polyuria, polyphagia, and weakness. Patients who develop symptoms of hyperglycemia during treatment with atypical antipsychotics should undergo fasting blood glucose testing.

The label did not mention weight gain or diabetes in the "warning to patients" section.

Lilly added the FDA-required language to the Zyprexa label on September 16, 2003. It issued a press release announcing the label change on September 17, 2003.

At the FDA's request, on March 1, 2004, Lilly sent a "Dear Doctor" letter to physicians in the United States informing them of the 2003 label change.

### 2. Consensus Statement of American Diabetes Association and Other Learned Groups

In November 2003, the American Diabetes Association, American Psychiatric Association, American College of Clinical Endocrinologists, and the North American Association for the Study of Obesity convened a consensus development conference (the "ADA consensus conference") on the subject of the association between antipsychotic drugs and diabetes. An eight-member panel heard presentations from fourteen experts drawn from the fields of psychiatry, obesity, and diabetes; FDA representatives; and atypical antipsychotic drug manufacturers. The panel reviewed most of the relevant peer-reviewed English language scientific articles.

The ADA consensus conference concluded that Zyprexa and Clozaril posed an increased risk of diabetes as compared to other atypical antipsychotic drugs. The consensus statement produced by the conference declared that these relative risks as well as advantages of the individual drugs for individual patients in a heterogeneous population "should ... influence drug choice." In part, its report concluded:

> There is considerable evidence, particularly in patients with schizophrenia, that treatment with [atypical antipsychotics] can cause a rapid increase in body weight in the first few months of therapy that may not reach a plateau even after 1 year of treatment. There is, however, considerable variability in weight gain among the various [atypical antipsychotics].... Clozapine [Clozaril]

and olanzapine [Zyprexa] ... produce the greatest weight gain.

> \*     \*     \*

Despite limitations in study design, the data consistently show an increased risk for diabetes in patients treated with clozapine [Clozaril] or olanzapine [Zyprexa] compared with patients not receiving treatment with [first generation antipsychotics] or with other [atypical antipsychotics]. The risk in patients taking risperidone and quetiapine is less clear; some studies show an increased risk for diabetes, while others do not. The two most recently approved [atypical antipsychotics], aripiprazole and ziprasidone, have relatively limited epidemiological data, but available clinical trial experience with these drugs has not shown an increased risk for diabetes.

> \*     \*     \*

> [T]he risks of obesity, diabetes, and dyslipidemia have considerable clinical implications in this patient population and should ... influence drug choice. Even for those medications associated with an increased risk of metabolic side effects, the benefit to specific patients could outweigh the potential risks. For example, clozapine [Clozaril] has unique benefits for treatment-refractory patients and those at significant risk for suicidal behavior. Since treatment response in many psychiatric conditions is heterogeneous and unpredictable, physicians and patients can benefit from the availability of a broad array of different therapeutic agents.

> \*     \*     \*

> These three adverse conditions [obesity, diabetes, and dyslipidemia] are closely linked, and their prevalence appears to differ depending on the [atypical antipsychotic] used. Clozapine [Clozaril] and olanzapine [Zyprexa] are associated

with the greatest weight gain and highest occurrence of diabetes and dyslipidemia. Risperidone and quetiapine appear to have intermediate effects. Aripiprazole and ziprasidone are associated with little or no significant weight gain, diabetes, or dyslipidemia, although they have not been used as extensively as other agents. The choice of [atypical antipsychotic] for a specific patient depends on many factors. The likelihood of developing severe metabolic disease should also be an important consideration.

### 3. FDA March 2007 Letter

On March 28, 2007, the FDA raised concerns about the adequacy of Zyprexa's warning label in a letter to Lilly.

[W]e are concerned that the labeling is deficient with regard to information about weight gain, hyperglycemia, and hyperlipidemia that is associated with olanzapine [Zyprexa] use.... Our overall goal is to improve labeling with regard to these findings so that clinicians will be better informed on what the risks are for their patients. They cannot make reasonable treatment decisions until they have such information. We do not feel that current labeling for ... Zyprexa provides sufficient information on these risks, and we fully intend to insure that ... labels are enhanced with the best available information to characterize these risks.

### 4. Findings on Medical Community's Knowledge of Zyprexa's Risks

A universally applicable date from which the statute of limitations is to be considered to run on an individual Zyprexa user's claim has not been determined. Numerous events represent moments at which a patient, health care provider, institution, or the medical community at large arguably discovered that the cause of an alleged injury may have been the administration of Zyprexa. The evidence in this mass litigation, including medical records and the depositions of numerous doctors, suggests that it was widely known and understood in the late 1990s among treating and prescribing physicians that weight gain may follow the administration of Zyprexa. The association between weight gain and heightened risks of diabetes was also broadly recognized by that time.

Formal events include the September 2003 Zyprexa label change and contemporaneous press release, the 2003 consensus statement of the American Diabetes Association, and the March 2004 "Dear Doctor" letter distributed nationwide to physicians by Lilly.

In its June 2007 memorandum, order, and judgment on the four motions for summary judgment, this court found that the March 2004 "Dear Doctor" letter would be considered the latest possible date on which members of the medical community knew or should have known about Zyprexa's obesity- and diabetes-related risks to patient health. *See Souther*, 489 F.Supp.2d at 278. In *Souther*, applying the relevant "learned intermediary" doctrine, it was determined that one plaintiff was barred by the statute of limitations:

Diabetes developed and Zyprexa was prescribed [to plaintiff Cusella] years before the September 2003 label change. *At least from the date of March 2004 Dear Doctor letter, the causal connection between Zyprexa and diabetes was known to Dr. Ganime, Cusella's treating physician.* Since Lilly's duty to warn ran to Dr. Gamine rather than Cusella, it became Dr. Ganime's duty from that point onwards to disclose to Cusella that Zyprexa might exacerbate his diabetes, and that it may have been the impetus

behind Cusella's insulin-dependancy in the first place.

Dr. Ganime's medical records and deposition testimony ... show that Cusella was warned numerous times about the link between Zyprexa and diabetes. While the pre-label change warnings Dr. Ganime received from Lilly *may* not have been adequate to absolve Lilly of liability to Cusella, those warnings Cusella received from Dr. Ganime following the label change placed him on notice that use of Zyprexa might have worsened his diabetes and caused him to become insulin-dependent.

*Measured either against the date Cusella developed diabetes—August 1999—or the latest possible date Dr. Gamine was aware of the potential causal connection between Zyprexa and diabetes—March 2004*—Pennsylvania's two year statute of limitations had run on Cusella's claim before he filed this suit in April of 2006.

*Id.* at 278 (emphasis added).

The March 1, 2004 date represents the "latest possible date" prescribing physicians and, in effect, their patients are deemed aware of the potential causal connection between Zyprexa and diabetes and from which the statute of limitations may run as to any individual plaintiff. Nevertheless, a fact-specific analysis is necessary for each case to determine when the plaintiff—whether independently or by operation of the learned intermediary doctrine—knew the potential causal connection between Zyprexa and adverse health effects. The facts in many individual cases, including the present one, indicate a much earlier date of discovery for purposes of the statute of limitations. *See, e.g.*, Appendices A–D of *Souther*, 489 F.Supp.2d 230 (including over 1500 pages of relevant depositions demonstrating doctors' awareness of Zyprexa's association with patient weight gain).

### C. Plaintiff's Medical History and Physicians' Knowledge of Zyprexa's Effects

#### 1. Psychiatric and Medical History

James Head, now fifty-six years old, was born in Tennessee. Pl. Controverting Statement of Facts, Ex. 1, at 23. He was first hospitalized for a psychiatric condition in June 1972, at the age of nineteen; he was then diagnosed with schizophrenia, paranoid type, and borderline mental retardation. *Id.*, Ex. 1, at 82; Def. Statement of Undisputed Material Facts (hereinafter "Def. SUF"), Ex. 5, HEADJ_SSA_0021–22, 0046, 0050–53. By 1975, he had had seven admissions to Tennessee's Central State Psychiatric Hospital. Def. SUF, Ex. 5, at HEADJ_SSA_0050–51. Records indicate complaints of auditory hallucinations and suicidal thoughts. *Id.* By 1979, he had been hospitalized more than fifteen times. *Id.*, Ex. 5, at HEADJ_SSA_0021–22; Pl. Controverting Statement of Facts, Ex. 1, at 61–67, 69–70. During this period, he was treated with a number of psychiatric medications. Def. SUF, Ex. 5, at HEADJ_SSA_0021–22. No medical records from the 1980s are part of the present record.

In 1992, Head moved to Arizona, where all events relevant to this litigation took place. There, he was diagnosed with bipolar disorder, a diagnosis which continues. Pl. Controverting Statement of Facts, Ex. 1, at 34, 41; Def. SUF, Ex. 6, at HEADJ_VO_0474–80, 1012–14. Some records suggest symptoms of mania, psychosis, and delusions of persecution. *See, e.g.*, Def. SUF, Ex. 6, at HEADJ_VO_0474–80, 1012–14; Ex. 7, HEADJ_MMC_0007–10, 1085–87, 1329–1334; Ex. 4, HEADJ_DVBH_072–073. Head has over the years been placed on heavy medication

regimens in an effort to manage these debilitating psychiatric problems. *See, e.g., id.*, Ex. 6, at HEADJ_VO_0474–80, 1012–14.

On October 24, 1997, Head was prescribed five milligrams per day of Zyprexa by Dr. Donald Dean at ValueOptions, a behavioral health care organization that provides services to residents of Maricopa County, Arizona, and elsewhere. *Id.*, Ex. 6, at HEADJ_VO_0869. Head reported a positive response, and requested an increase in the dosage. *Id.*, Ex. 6, at HEADJ_VO_0835–36, 0840–41. His Zyprexa prescription was doubled by another ValueOptions physician in January 1998. *Id.*, Ex. 6, at HEADJ_VO_0815–16. Later that month, his psychiatric condition was deemed to be "well controlled and stabilized on [the] current regimen of Zyprexa" and other medications. *Id.*, Ex. 6, at HEADJ_VO_0682–85. Head and his physicians appear to have been satisfied with the drug's efficacy over the next few years; Head stated at one 2001 medical appointment that "everything [is] great just the way it is so don't change anything." *Id.*, Ex. 6, at HEADJ_VO_1350–51, 1360–61, 1364–65, 1372–73, 1394–95, 1430–31, 1436–37, 1440–41, 1450–51.

On December 5, 2002, medical documentation indicates that Head's physician verbally reviewed with him a ValueOptions informed consent form that listed Zyprexa's side effects. *Id.*, Ex. 6, at HEADJ_VO_2799. Head chose not to sign the form because he was unable to read; records indicate that Head suffers from severe eyesight problems, including legal blindness. *Id.*, Ex. 6, at HEADJ_VO_0050, 1581. The doctor noted that Head nevertheless "appeared to comprehend" the form's content. *Id.*, Ex. 6, at HEADJ_VO_2799. Under "More Common Side Effects," the form mentions "weight changes." *Id.* Under "Uncommon/Rare Side Effects," the form provides

that "[c]hanges in liver or kidney function, *the way your body uses sugar*, menstrual cycle, sexual function, breast enlargement and milk production, nausea, loss of appetite, are all possible side effects of this medication." *Id.* (emphasis added).

Records from the years 2002 and 2003 reveal that Head's weight remained stable at about 170 pounds. *Id.*, Ex. 6, at HEADJ_VO_1321–22, 1360–61, 1471–72; Ex. 8, at HEADJ_PFPL_0015–16, 0062–64. In 2003, Head's Zyprexa prescription was increased to twenty milligrams—and possibly thirty milligrams—per day. *Id.*, Ex. 9, at HEADJ_OD_005; Ex. 6, at HEADJ_VO_1288–89, 2101. By the summer of 2003, his symptoms had worsened, with an increase in psychotic features, delusions, and agitation. *Id.*, Ex. 6, at HEADJ_VO_1283–84, 1288–89, 1292–93; Ex. 7, at HEADJ_MMC_1099–1104, 1195–99. Zyprexa was then discontinued in favor of a combination of other drugs, including Risperdal, Valium, Depakote, and Lithium Carbonate. *Id.*, Ex. 7, at HEADJ_MMC_1099–1104.

In May 2004, medical records note that Head was doing poorly; five milligrams of Zyprexa were added to his treatment regimen. *Id.*, Ex. 6, at HEADJ_VO_1626, 2097. His weight was 184 pounds at the time. *Id.*, Ex. 7, at HEADJ_PFPL_0007. A positive response to the reinitiating of Zyprexa was almost immediate. The dosage was soon increased by his doctor. *Id.*, Ex. 6, at HEADJ_VO_1616–17, 1620–21.

In July 2004, Dr. Jose Agosto became Head's prescribing physician. *Id.*, Ex. 6, at HEADJ_VO_1603–04. He made an independent evaluation, concluding that Head was clinically stable on Zyprexa and that no change to his prescription was warranted. *Id.*, Ex. 10, at 47–48. During the remainder of 2004 and through 2005, Head reported doing well on his medications. *Id.*, Ex. 6, at HEADJ_VO_0192–93, 0335–

36, 0350–51, 0360, 0374–75, 1580–81, 1603–04; Ex. 10, at 63–65; Pl. Controverting Statement of Facts, Ex. 1, at 99–100. His weight surpassed 200 pounds in February 2005 and reached 207 pounds in April 2005. Def. SUF, Ex. 7, HEADJ_PFPL_0002, 0005.

On November 11, 2005, Head was diagnosed with diabetes. *Id.,* Ex. 6, at HEADJ_VO_0016–26, 2299–2302. Dr. Agosto noted his intention to "start to taper [Head] down off the Zyprexa and start him on another medication." *Id.;* Ex. 10, at 24–25. Zyprexa was discontinued and replaced by a combination of medications a short time later. *Id.,* Ex. 6, at HEADJ_VO_0089, 0178–79. Since that time, he has suffered from delusions, mania, and agitation, requiring some hospitalization. *Id.,* Ex. 6, at HEADJ_VO_0016–26, 1784; Ex. 7, at HEADJ_MMC_0007–10. Head now experiences auditory and visual hallucinations and increased aggravation and aggression. *Id.,* Ex. 6, at HEADJ_VO_0050–59.

### 2. Prescribing Physicians' Knowledge of Zyprexa's Risks

The only prescribing physician for whom first-hand information about knowledge of Zyprexa's metabolic side effects is available is Dr. Agosto. At the time he treated Head, Dr. Agosto was aware that Zyprexa users are at increased risk of weight gain and that patients who are obese or overweight are at greater risk of developing diabetes. *Id.,* Ex. 10, at 31–32, 58, 78–79. His treatment of Head—and decision to prescribe Zyprexa for him—was made in July 2004, after Lilly's September 2003 Zyprexa label change and the March 2004 "Dear Doctor" letter notifying the medical community of Zyprexa's metabolic risks.

Dr. Agosto testified that he would not necessarily discontinue Zyprexa for a patient who was gaining weight if, after individualized assessment, he determined that such a side effect might be outweighed by the medication's benefits to that patient. He described his treatment decision process during the period Head was under his care. For patients already using Zyprexa, it was based on their symptom severity, "on their previous history[,] other medications and the compensation rate[,] the hospitalizations[,] and the way [they were] doing with Zyprexa." *Id.,* Ex. 10, at 34. He testified that "sometimes we used to decide to keep the patient on Zyprexa and monitor them more frequently." *Id.*

Prior to the time of Dr. Agosto's treatment of Head, the evidence suggests that Head's prescribing and other physicians at ValueOptions may not have known about the nature and scope of Zyprexa's diabetes-related side effects. The organization's 2002 consent form, used by at least one provider to communicate Zyprexa's potential side effects to Head, reveals that the ValueOptions medical staff considered "the way your body uses sugar"—presumably an endocrine function issue related to diabetes—was among the "Uncommon/Rare Side Effects," rather than a more common effect, as a Lilly warning should arguably have provided. *Id.,* Ex. 6, at HEADJ_VO_2799. The content of this 2002 form suggests that a jury could find that Head's doctor, and the entire ValueOptions medical staff, did not possess a full and timely understanding of the extent of Zyprexa's metabolic risks at that time.

### IV. Law

#### A. Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material fact ... [in which case] the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Mitchell v.*

*Washingtonville Central School District,* 190 F.3d 1, 5 (2d Cir.1999). Summary judgment is warranted when after construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c); *see Anderson,* 477 U.S. at 247–50, 255, 106 S.Ct. 2505; *Sledge v. Kooi,* 564 F.3d 105, 108 (2d Cir.2009).

The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. *See* Fed.R.Civ.P. 56(e). This evidence may not consist of "mere conclusory allegations, speculation or conjecture." *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996); *see also Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) ("Conclusory allegations will not suffice to create a genuine issue.").

### B. *Choice of Law*

A multidistrict litigation transferee court applies the choice of law and statute of limitations rules of the state in which the action was filed. *Menowitz v. Brown,* 991 F.2d 36, 40 (2d Cir.1993) (citing *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). Since this action was commenced in the United States District Court for the District of Arizona, Arizona choice of law principles govern. Head resided in Arizona when he was prescribed Zyprexa. His alleged injuries occurred in Arizona. Arizona has the most "significant relationship" to the events, injuries, and parties in this case. *Jackson v. Chandler,* 204 Ariz. 135, 61 P.3d 17, 18–19 (2003); *see also Inter–Tel, Inc. v. Fulton Comm. Tel. Co.,* No. 07–866, 2007 WL 1725349, at *4 (D.Ariz. Jun 12, 2007) (applying Arizona state law in conflict of laws "significant relationship" analysis under the Restatement (Second) of Conflicts of Laws). Arizona substantive law applies to Head's claims.

### C. *Learned Intermediary Doctrine*

The "learned intermediary" doctrine provides that manufacturers of prescription drugs and medical devices discharge their duty of care to patients by providing adequate warnings to prescribing physicians. *See Piper v. Bear Medical Systems, Inc.,* 180 Ariz. 170, 883 P.2d 407, 415 n. 3 (Ariz.Ct.App.1993). It is an exception to manufacturers' legal duty to warn consumers of a product's risks and dangers in the case of prescription drugs. *See Gaston v. Hunter,* 121 Ariz. 33, 588 P.2d 326, 340 (Ariz.Ct.App.1978).

When a physician is aware of the risks of a prescription drug but still prescribes it for a patient, or would not have modified any prescribing or treatment decision even if a different warning were given, a manufacturer's failure to warn cannot be the proximate cause of a subsequent injury to the patient. *See Gebhardt v. Mentor Corp.,* 191 F.R.D. 180, 184–85 (D.Ariz.1999) (granting summary judgment where plaintiff failed to present evidence that doctor would not have treated patient with the allegedly dangerous medical product if different warnings had been given).

Under Arizona state law, plaintiff's claim of failure to warn must be supported by some specific, individualized evidence that the alleged informational defect caused the harm. *See Southwest Pet Products, Inc. v. Koch Industries, Inc.,* 273 F.Supp.2d 1041, 1061–62 (D.Ariz.2003); *see*

also *Dole Food Co., Inc. v. North Carolina Foam Industries, Inc.,* 188 Ariz. 298, 935 P.2d 876, 883 (Ariz.Ct.App.1996) ("What is required is evidence that had a proper warning been given, [the plaintiff] would not have used the product in the manner which resulted in his injury, or ... evidence that certain precautions would have been taken that would have avoided the accident.") (internal quotation marks omitted).

■ "Although ordinarily the issue of proximate cause is a question of fact, summary judgment may be appropriate absent proper evidentiary foundation." *Southwest Pet Products,* 273 F.Supp.2d at 1062 (citing *Gosewisch v. Am. Honda Motor Co., Inc.,* 153 Ariz. 400, 737 P.2d 376, 379 (1987)); *see also Gebhardt,* 191 F.R.D. at 185; *cf. Golonka v. General Motors Corp.,* 204 Ariz. 575, 65 P.3d 956, 966–67 (Ariz.Ct. App.2003) (denying summary judgment only after a finding that plaintiff had met burden of presenting some evidence of a causal link between lack of warning and injury). The learned intermediary doctrine is a critical aspect of the causation analysis. It "cannot be viewed as an all-or-nothing regulation that absolves the manufacturer, shifting the onus entirely to the treating physician, but its force in ameliorating liability for damages of the manufacturers cannot be ignored." *Souther,* 489 F.Supp.2d at 244.

There is a strong trend in prescription drug failure-to-warn cases to reiterate and apply this well established doctrine. *See, e.g., Motus v. Pfizer Inc.,* 358 F.3d 659, 661 (9th Cir.2004) (holding that a product defect claim based on insufficient warnings cannot survive summary judgment if stronger warnings would not have altered the conduct of the prescribing physician) (citing *Plummer v. Lederle Labs., Div. of Am. Cyanamid Co.,* 819 F.2d 349, 358–59 (2d Cir.1987)); *Ebel v. Eli Lilly & Co.,* 536 F.Supp.2d 767 (S.D.Tex.2008) (granting summary judgment for defendant upon finding that prescribing physician was aware of Zyprexa's suicide-related risks that an adequate warning would have provided and that plaintiff had presented no evidence physician would not have prescribed Zyprexa had defendant provided him with an alternate warning label), *aff'd,* 321 Fed.Appx. 350 (5th Cir.2009); *Allgood v. GlaxoSmithKline PLC,* No. 06–3506, 2008 WL 483574, at *3 (E.D.La. Feb. 20, 2008) (granting summary judgment for defendant because plaintiff had failed to show (1) that defendant did not adequately warn the physician of a risk associated with the drug that was not otherwise known to the physician and (2) that the "failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury"), *aff'd sub nom. Allgood v. SmithKline Beecham Corp.,* 314 Fed.Appx. 701 (5th Cir.2009).

## V. Application of Law to Facts

### A. *Expert Testimony of Dr. Stephen J. Hamburger*

Dr. Stephen J. Hamburger submitted an expert report supporting plaintiff's claims. He has been excluded as an expert after a full hearing. *See In re Zyprexa Prods. Liab. Litig.,* No. 04–MD–1596, 2009 WL 1357236 (E.D.N.Y. May 12, 2009). An expert opinion is not required at this stage because Lilly's motion for summary judgment relies upon application of the learned intermediary doctrine to bar this suit from proceeding. Plaintiff indicates that, in the interests of judicial and litigation efficiency, a new expert would be designated only if summary judgment were denied. Such an expert would presumably opine that Zyprexa was the substantial cause of Head's diabetes and all damages relating to the diagnosis. For purposes of the instant motion, the court assumes that a

reasonable juror could find that Zyprexa use caused or worsened plaintiff's weight gain and diabetic condition.

### B. *No Proximate Causation as to Prescription and Injury*

■ Plaintiff has failed to meet his burden of establishing that any inadequacy of Lilly's warning of Zyprexa's metabolic side effects caused the injury. No testimony from Dr. Agosto, who did not start treating Head until after the March 2004 Dear Doctor letter informing all physicians of Zyprexa's metabolic risks, or any other prescribing physician supports a conclusion that an alternative warning would have changed the decisions to prescribe or maintain Head's successful treatment with Zyprexa. The content of the 2002 ValueOptions consent form does put into question whether Head's prescribing physician and other providers were at that time aware of the metabolic risks an alternative Lilly warning arguably would have provided. Yet, without any specific evidence creating a material issue of whether Head's doctors would have made a different prescribing or other treatment decision, summary judgment is proper. *See Gebhardt*, 191 F.R.D. at 184–85; *Southwest Pet Products*, 273 F.Supp.2d at 1061–62; *Dole Food Co.*, 935 P.2d at 883.

The factual record requires a finding that, given the serious psychiatric problems manifested by Head, his favorable response to Zyprexa, and the ineffectiveness of a number of other medications, his doctors exercised their professional judgment to prescribe this drug. There is no indication that an alternative warning would have had any impact on plaintiff's psychiatric or other medical treatment. A failure to warn cannot be shown to be a causal factor with respect to plaintiff's injuries.

■ There is no evidence that "overpromotion," as argued by plaintiff, had any bearing on the decision of Head's doctors to prescribe Zyprexa. In unusual cases, courts have found that a drug manufacturer's excessive promotion of its product may negate or call into question operation of the learned intermediary doctrine. *See Hamilton v. Hardy*, 37 Colo. App. 375, 549 P.2d 1099, 1110 (1976); *Stevens v. Parke, Davis & Co.*, 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653 (1973); *Salmon v. Parke, Davis & Co.*, 520 F.2d 1359 (4th Cir.1975); *Incollingo v. Parke, Davis & Co.*, 444 Pa. 263, 282 A.2d 206 (1971). A plaintiff arguing in favor of application of the overpromotion exception with respect to a prescription drug must establish with *individualized* proof that such overpromotion caused the physician to initiate or maintain the prescription at issue. *See, e.g., Motus v. Pfizer Inc.*, 196 F.Supp.2d 984, 999 (C.D.Cal.2001). General claims of overpromotion are not sufficient. *Id.* Plaintiff has provided only the most general allegations of overpromotion of Zyprexa by Lilly; the argument is insufficient to prevent application of the learned intermediary doctrine in this case.

## VI. Conclusion

The motion for summary judgment is granted.

SO ORDERED.